## STANLEY v. THE CITY OF DAVENPORT.

1. **Practice in the Supreme Court:** APPEAL: DISMISSAL OF. An appeal lies from an order striking from a pleading all the allegations having reference to one of the material issues tendered by the pleading, and the fact that other issues remain for trial in the court below will not authorize a dismissal of the appeal.

2. **Municipal Corporations:** OCCUPATION OF STREETS BY RAILROADS. The power granted to railway companies by section 1262 of the Code, to occupy the streets of cities with their tracks, is, by implication, withdrawn by the amendment contained in chapter 47, laws of 1874.

3. ——: USE OF STEAM MOTORS IN STREETS: NEGLIGENCE. In an action against a city to recover for personal injuries caused by the frightening of plaintiff's horse by a steam motor, used upon a street railway by permission of the city council, it was held that, in the absence of express statutory authority, a city has no power to authorize or permit the use of steam motors upon its streets, either upon ordinary railroads or street railways, and the grant of such authority or permission constitutes negligence which will render the city liable for damages caused thereby.

4. ——: ——: ——. The fact that the action of the city council in granting such right was without authority would not protect the city from liability, corporations being responsible for the acts of their officers and agents done within the apparent scope of their authority, and the streets of a city being under the control of the city council.

ADAMS, J., *dissenting*, holds that the use of a street for the operation of a street railway thereon is not open to the same objection as its use for the purposes of an ordinary railroad, but is a legitimate use for street purposes; that it may, as such, be permitted by the city council under their general power to regulate the use of streets, and that they may properly allow the use theron of cars drawn by horses, steam power, or such other motors as in their judgment will best subserve the public convenience.

*Appeal from Scott Circuit Court.*

### WEDNESDAY, OCTOBER 6.

THE petition states that the plaintiff, while driving a horse harnessed to a wagon along and upon a street in the city, and without fault and negligence on her part, was violently thrown from the wagon by reason of the horse taking fright at a steam motor there being used on said street under the

| | |
|---|---|
| 54 | 463 |
| 80 | 144 |
| 54 | 463 |
| 92 | 194 |
| 54 | 463 |
| 101 | 122 |
| 54 | 463 |
| f110 | 185 |
| 54 | 463 |
| 112 | 24 |
| 54 | 463 |
| 113 | 304 |
| 54 | 463 |
| 118 | 295 |
| 54 | 463 |
| 131 | 571 |
| 131 | 575 |
| f131 | 577 |
| 54 | 463 |
| 137 | 73 |
| 137 | 646 |
| 54 | 463 |
| 138 | 433 |
| 54 | 463 |
| j141 | 602 |
| 54 | 463 |
| 143 | 732 |

authority and permission of the defendant. It is alleged the plaintiff was greatly injured, and a recovery therefor is sought. There were two counts in the petition. To the first there was a demurrer, which was sustained, and the plaintiff excepted, and refusing to plead further, judgment was rendered against her. It was stipulated by counsel, when the demurrer was submitted, that it presented for determination the following question: "Whether or not it was negligence on the part of the defendant to permit the use of a steam motor on Brady Street under the written authority set out in said petition, and allowing it to remain and be used thereon?" The written authority referred to is a resolution of the city council granting permission to use the motor on Brady Street for thirty days.

The second count set out a cause of action based on the use of the motor, substantially as the same was stated in the first count. There were also other acts of negligence alleged in the second count because of which the plaintiff claimed to recover. The defendant filed a motion to strike out of the second count all the allegations relating to the motor. The motion was sustained, and the plaintiff excepted, but no judgment was rendered dismissing the action. The plaintiff appeals, and assigns as error the action of the court in sustaining the motion and demurrer.

*A. J. Hirschl*, for appellant.

*H. M. Martin*, for appellee.

SEEVERS, J.—I. The appellee insists because no judgment was rendered on the motion, other than merely sustain-

1. PRACTICE in the supreme court: appeal : dismissal of.

ing it and striking out the allegations objected to that the appeal must be dismissed. It is conceded an appeal lies from the ruling on the demurrer, but it is stated and admitted in the abstract that the cause is pending and for trial in the court below on the remaining cause of action in the second count. The argument, briefly

stated, is that an action cannot be pending in this court and the court below at the same time. While here, the cause may be tried below and a recovery had. If so, the prosecution of the appeal would be unnecessary; and that a cause cannot be tried by piecemeal—a part before and another part after the appeal has been determined. Appeals to this court are regulated by statute. By reference thereto the question presented can be readily solved.

It is provided that an "appeal may be taken to the Supreme Court from an intermediate order involving the merits, and materially affecting the final decision." Code, § 3164. The motion involved the merits, and when it was sustained the final decision was vitally affected; for as the pleadings now stand in the court below the plaintiff cannot introduce any evidence in relation to the steam motor, nor can the right of the defendant to authorize its use be controverted in this action. By sustaining the motion the Circuit Court has stricken all allegations upon which such question can be based from the pleadings. By the express words of the statute an appeal lies in such case. By what authority can an appeal properly taken be dismissed? None other, we think, than statutory authority. Counsel have not called our attention to such a statute, and we know of none. If the remaining cause of action had been tried, it is possible, whatever might have been its result, it would be deemed a waiver of the appeal if brought to the attention of this court at the proper time. Code, § 3212. It is probable also that the court below would have the power to postpone a trial there until the appeal was disposed of. There is nothing in the record which tends to show the plaintiff has done anything since the appeal was taken which amounts to a waiver, or will authorize a dismissal of the appeal. In fact the record fails to show that an issue has been formed, or that either party desires a trial below until this appeal is determined.

II. In 1870 the defendant granted to the Davenport

Central Railroad Company " the exclusive right to lay and

2. MUNICIPAL operate upon     *     *    Brady    *     *
corporations:
occupation of street in said city a single horse railway with the
streets by
railroads.     necessary side tracks." The right of the city to
make this grant is not questioned.

In 1878 the city granted " I. M. Davies permission to run one of Baldwin's Noiseless Steam Motors on Brady street hill on probation for thirty days." The Motor was run and oper- ated on the track of the street railway company.

It has been held that cities have the authority to grant railway companies who use steam in operating their roads the right to occupy with their tracks a street or streets of the city. *Milburn v. Cedar Rapids*, 12 Iowa, 246, and numerous other cases. These decisions were based on a stat- ute providing that " any railway corporation may raise or lower any turnpike, plank road or other highway for the purpose of having its railway pass over or under the same, and in such cases said corporation shall put such highway as soon as may be in as good repair and condition as before such alteration." Code, § 1262. In the Milburn case the words " pass over " were construed to mean " upon" or " length- wise," and this construction has been several times followed in subsequent cases. As thus construed the legislative assent had been given to the laying down of railway tracks in streets and the operation of the same by the use of steam, subject, however, to proper equitable control and police regulations. *Newton & S. W. R. R. Co. v. The Mayor, etc.*, 36 Iowa, 299. But it never has been held that cities had the authority to grant such privileges in the absence of a legislative grant to that effect. Whatever may have been said by judges who have written opinions in the cases in which this question has been determined or discussed, it is quite apparent, we think, that all the cases subsequent thereto are based on the Mil- burn case, which, as we understand, is based on the statute. It is worthy of note that, notwithstanding the several deci- sions following the Milburn case, it has not been deemed sat-

,isfactory to the profession or general public. This is apparent from the numerous cases in which the doctrine of that case has been vigorously assailed by counsel.

Finally, in 1874, the General Assembly enacted a substitute for Code, § 1262, which provides that railway corporations may "cross over or under" any highway with its railway. Chapter 47, Laws of Fifteenth General Assembly. To cross over or under does not mean upon or lengthwise. Under the circumstances the legislative intent has been clearly expressed, and it is to the effect that railways operated by steam cannot be constructed upon streets and highways except as provided in a section of the Code hereinafter referred to. Or, if this be not true, the legislative assent contained in section 1262 of the Code has been withdrawn by the enactment of the statute of 1874. We are not called on to vindicate or condemn the wisdom of this statute; to construe or ascertain its meaning is our only province. The various decisions above referred to are not now correct expositions of the law, because they have been superseded by that branch of the government whose province it is to enact, but not to construe, the law.

III. The remaining question is whether the city had the authority, in the absence of a grant from the general assembly, to authorize or permit the use of the steam motor on Brady street in said city. If such power did not exist, the permission given could well be styled negligence, for which the city should be held responsible. Unless the city can shield itself by reason of its authority in the premises, the permission to use the motor on the street constituted negligence. That it was an experiment is not material. If the power existed, it matters not whether the authorized use was for a long or short period of time.

The defendant was organized under a special charter, and it is stipulated by counsel that neither the charter or ordinances of the city expressly prohibit the street railway company "from using other than animal power in operating its

road," nor does the charter or ordinances contain a grant to that effect: therefore, we think it must be true the street railway company had no right to use or authorize the use of steam on its track; hence the application to the city council, and the necessity that it should grant the requisite permission.

The charter empowers the defendant to "open, alter, abolish, widen, extend, establish, grade, pave, or otherwise improve and keep in repair, streets, avenues and alleys." That the requisite power is not contained in the charter we regard as beyond serious controversy. We feel the more certain of this because the learned counsel for the city does not claim such authority is contained therein. It may be that cities organized under the general incorporation law have such authority; if so, it is because there is a statute to that effect. Code, § 464. Such statute, however, is not applicable to the defendant.

The fee of the streets is in the city, and yet it is held in trust for the use and benefit of the public. The city does not have the authority to sell and convey the title held by it or authorize the streets to be used for private purposes. Nor can it without legislative authority grant the use of a street for a public purpose, which renders it dangerous for the public to travel over it in any other manner. The power partakes of that of eminent domain, which, under our government, can only be granted by the law-making power of the state.

Streets and highways are under the exclusive control of the general assembly. It matters not if the fee of the streets is in the city, it has no authority to control or grant rights and privileges thereto or thereon, unless it has been so authorized. The power and authority of the city is contained in its charter and bounded thereby. It has no other or different control of the streets than is prescribed in the charter or the general statutes of the state. A distinction has been drawn between a railway operated by horse and steam power,

and whether the defendant may authorize the former and not the latter is not in this case, and we only allude thereto lest we may be misunderstood.

The strong current of the authorities, as we understand, is in accord with the views herein expressed. 2 Dillon's Municipal Corporations, 567, 568; *Davis v. The Mayor*, etc., 14 N. Y., 506; *Milshaw v. Sharp*, 27 N. Y., 611; *Commonwealth v. W. E. R. R. Co.*, 27 Pa. St., 344; *Protyman v. I. C. R. R. Co.*, 9 Ind., 468; *State v. Inhabitants of Trenton*, 36 N. J. L., 83; *Memphis City R. R. Co. v. Memphis*, 4 Coldw., Tenn., 406.

IV.  It is suggested, but not pressed in argument, that, the act of the city council being without authority, the city is not responsible for any consequences resulting therefrom. The city had jurisdiction of the subject matter, that is, of the streets, and could only act in relation thereto through its council. The latter had control of the streets of the city, but were mistaken as to the extent of their authority. The particular thing the council authorized to be done was illegal, and we think the city is responsible for the consequences resulting therefrom.

The modern doctrine we understand to be this: " Whenever an action for an injury to the property or person of another will lie against an individual, corporations will in like circumstances be equally liable for injuries committed by their officers and agents, acting within the apparent scope of their authority." It was, therefore, held in *Lee v. The Village of Sandy Hill*, 40 N. Y., 442, that the defendant was liable for a trespass committed under the direction of the village trustees. The trespass consisted in removing a fence which they erroneously supposed encroached upon the street. In *The City of Pekin v. Newell*, 26 Ill., 320, the city was authorized " to build and construct an embankment and plank road across the Illinois river bottom opposite said city." Instead of so doing a pile bridge was constructed in such a negligent manner that the horse of the defendant in error

fell through the bridge and was killed. The city sought to defend on the ground that the bridge was built without authority, but it was, rightly, we think, held otherwise. Other authorities might be cited to the same effect.

REVERSED.

ADAMS, J., *dissenting.*—Decisions in relation to the occupancy of streets by ordinary railroads, not designed for street purposes, are, in my judgment, not strictly applicable to this case. A street railroad, whether operated by animal, steam, or other power, is not an obstruction to the same extent. It is consistent with all the legitimate uses to which a street is put, and has come to be deemed a public necessity.

In my opinion a city council may regulate the use of streets without any special grant of power in this respect, and may, in its discretion, with a view to promoting the public interest, allow cars to be drawn thereon for street purposes, either by animals, steam, atmospheric pressure, or other power, and that, too, though the cars or motors may be such as to cause fright to some extent to timid horses. It must, I think, be allowed in each case to judge of the objectionableness, if any, of proposed cars or motors, and whether the inconvenience, if any, resulting to any persons, as causing fright to horses, would be such as to overcome the considerations of public necessity or advantage.

Steam fire engines are well calculated to frighten timid horses, yet no one supposes that a city council may not permit them to be drawn upon a street. Many other things may be done in streets which are calculated to frighten timid horses, but they are not necessarily to be forbidden for that reason. Private convenience must oftentimes yield to what is deemed a paramount public convenience.

When the city council of the defendant city granted permission to use a motor upon one of its street railways, we must presume that it did so because it considered that the

public convenience demanded it, and the defendant city should not, in my judgment, be held liable for the injury resulting from the fright of the plaintiff's horse.

Whether a city council, without express authority from the legislature, can grant an exclusive right to operate a street railroad, by the use of a motor or otherwise, or what right it can grant, if any, are entirely different questions. Upon them I think that the decisions have not been entirely uniform. If the city council can grant no right, then an attempt to do so would be void, and the ground of the plaintiff's complaint would be simply that the city suffered the motor to be used. But such sufferance would not in my judgment be negligence, because I think that a city council may exercise a discretion in relation to what it shall suffer, and what it shall forbid, so long as it acts in good faith, and with a view to promoting the public convenience. I see no error in the ruling of the Circuit Court.

## ON REHEARING.

SEEVERS, J.—A rehearing was granted on the application of the defendant, and it is deemed best to restate the material question determined in the foregoing opinion, and state more fully the reasons inducing us to adhere thereto.

The pivotal question is, although the fee-title to the streets is in the city, yet it is held in trust for the public, subject to the control of the general assembly. Assuming for the present this proposition to be correct, it necessarily follows the sovereign power may, or may not, grant to cities the power to grade or otherwise control the same. Therefore, the claimed power, whatever it may be, should affirmatively appear to have been expressly granted in the charter, general statutes, or can be necessarily implied therefrom. So far from this being so, we think the contrary has been clearly indicated. Section 464 of the Code provides that cities may authorize or forbid the construction of railways in streets, but such authority can-

not be granted by the city except on condition the abutting property owner shall be compensated. When this statute was enacted, Code, § 1262, or the right of way act was in force, which authorized railroad companies to construct their roads lengthwise along streets. Section 464 of the Code affected all the cities in the State except six or eight organized under special charters.

Afterward there was enacted chapter 47, of the acts of the Fifteenth General Assembly, repealing § 1262 of the Code, and enacting a substitute therefor. See McClain's Code, § 1262. This last statute authorizes railways to cross over or under any highway. There are no other statutes bearing on the subject under consideration, therefore, it can be safely affirmed there is none giving the consent of the sovereign power to the construction of a railroad lengthwise along any highway.

It is insisted the Milburn case was not based on Code, § 1262, and that the foregoing opinion overrules that case. To this it may be said, in the first place, that such statute was in existence when that and all other cases were decided in which the question under consideration was before the court, and, therefore, no such question as the one now before us could have arisen in those cases. But it seems to us there can be no doubt as to what was decided in the Milburn case, or the ground upon which it was placed. It is there said: "Now the law making power of this State has thought proper, as we construe the statute, to give to railway companies the right to construct their railways upon streets of cities, and they have invested the local governments of those cities both with the fee of the soil of the streets, and the exclusive control over the same, and if, in the exercise of their proprietary rights and police regulations over streets, they should determine that iron rails and their use are a legitimate street improvement, upon what ground can the court determine otherwise, or control their authority in this respect. We apprehend none, for the reason that both the *company and the city have derived*

*their rights and privileges in the premises from the sover-
eign power of the State,* which cannot be supposed to auth-
orize that which would amount to a nuisance." In order to
emphasize what we understand to be the ground upon which
the decision is based, we have italicized a portion of the quo-
tation. The decision rests on the grant of the sovereign
power and the city. This last, in the subsequent case of *The*
*City of Clinton v. The Cedar Rapids & M. R. R. Co.,* 24
Iowa, 455, was held to be unnecessary, and that the company
could rest securely on the legislative grant. This being es-
sential, that of the city immaterial. The only statute relied
on by the court in either of those cases was the right of way
act. It is true there was some difference of opinion as to
the governing statute, but this is immaterial in the present
case.

It is said that " cities, by virtue of the original dedication
of the streets to the corporation, obtained authority to devote
them to railroad purposes," and that this doctrine was an-
nounced in *Cook v. The City of Burlington,* 36 Iowa, 357.
The same point was made by counsel in *Hughes v. M. & M.*
*R. Co.,* 12 Iowa, 261, but the case was determined on the
ground stated in the Milburn case. The only point decided
in the Cook case was that the city might voluntarily do what
the railroad company could accomplish by calling into ex
ercise the power of eminent domain.

It is not claimed the dedicator in the act of dedication pro-
vided that said roads might occupy the streets, but as the act
of dedication is silent as to the uses that may be made of the
streets, the authority " given to cities by the statute regulat-
ing their dedication to the public" cannot be abridged. This
implies there is an affirmative statute other than the charter
giving cities control of the streets. We fail to find any such.
There have been several enacted from time to time regulating
the dedication of streets and public grounds. They are all
in substance the same, and provide that " the acknowledg-
ment and recording of such plat is equivalent to a deed in

fee simple of such portion of the lands as is therein set apart for public" use. Code of 1851, § 637. .

The title is vested in the city for the use of the public. The city holds the title in trust for the public. The latter is, and can only be, represented or bound by the sovereign or law-making power. The city is much less than this, being the creature of such power, and possessing. only the powers expressly granted or necessarily implied. 1 Dillon on Municipal Corporations, § 55.

It is admitted on all hands the highways of the State are subject to the law-making power, and their use is controlled and governed thereby. Mills on Eminent Domain, § 203.

It is conceded the city, having first obtained the legislative assent, has authority to grant railway companies the right to use, and occupy with their track, a street of such city, and there is nothing in any of the opinions cited in *Kucheman & Hinke v. The C., C. & D. R. Co.*, 46 Iowa, 366, which can be properly construed as going beyond this.

This whole doctrine is summed up in 2 Dillon's Municipal Corporations, § § 575, 576 and 577, after an examination of the reported cases by the learned author, and it is there said: " Where the fee of the street is in the municipality in trust for the public, or in the public, the control of the legislature is supreme, and it may authorize or delegate to municipal bodies the power to authorize either class of railways to occupy streets without providing for compensation either to the municipality or the adjoining owners."

Our examination of the authorities leads us to the conclusion that the stated proposition is undoubtedly correct.

Counsel cite *Moses v. The Pittsburgh & Fort Wayne R. R.*, 21 Ill., 516; *I., B. & W. R. R. Co. v. Hartley*, 67 Id., 439; *Lexington & Ohio R. R. Co. v. Applegate*, 8 Dana, 289; *Atchison & Nebraska R. R. Co. v. Garside*, 10 Kan., 552; and other cases. Lengthy quotations are made from some of the opinions for the purpose of establishing the proposition that cities have the power to authorize railroads to occupy a street

independent of a right of way act or other legislative authority. In all of the cited cases the requisite authority had been granted either in the charters of the city, company, or general statutes, and the contest was whether this could be done without compensating the abutting owner, and no more or less was decided therein than in the Milburn case.

No adjudicated case to which our attention has been called, and we believe it may safely be affirmed none exists, in which it has been held a city may authorize a railroad operated by the use of steam to occupy the streets of a city, unless authority to this effect has been granted by the sovereign power.

It is said: "All courts everywhere have for the last fifteen years, without a dissenting opinion, conceded the authority of cities to grant the use of streets for horse-railways." Because of this, it is further said when it is admitted cities have authority to decide that one kind of advanced mode of travel may be allowed, their jurisdiction is conceded, and cannot be controlled by the courts. We shall not stop to discuss either proposition. It will be conceded, if no change is made in the grade of the street, the weight of authority seems to be the city may authorize a horse-railway to occupy the same. This doctrine is based on the ground "there is no annoyance from fire, smoke, steam-whistles, or rapid progress, and it does not signify that the street railroad has an exclusive right to use its own track when occasion requires." Mills on Eminent Domain, § 205. It was so held in *Henchman v. The Patterson Horse R. R. Co.*, 17 N. J. Eq., 75; and in that State the fee of the streets is in the abutting owner. It had been previously held in *Starr v. Camden & Atlantic R. R. Co.*, 24 N. J. Law, 592, that a highway could not be occupied by a railroad operated by steam, with legislative consent, without compensating the abutting owner. Both these cases are referred to with approval in *Jersey City & Bergen R. R. Co. v. Jersey City & Hoboken Horse R. R.*, 20 N. J. Eq., 61, upon the ground, it is presumed, stated in *The Inhabi-*

*tants of Springfield v. Connecticut River R. R.*, 4 Cush., 63, that where a road is operated by steam, and used by the general public also, the two uses are "almost if not wholly inconsistent with each other, so that taking the highway for a railroad will nearly supersede the former use to which it had been legally appropriated." This doctrine has not to our knowledge been anywhere impugned. It does not, therefore, follow the conceded proposition that a city may lawfully allow the streets to be occupied by a horse-railroad, that it may do so where the road is operated by steam power.

The question before the court was whether the defendant had authority to permit the steam motor to be used on the street named in the petition. This question was determined in the negative. This being so, the further question arose whether the defendant was liable, conceding the allegations of the petition to be true. This was determined in the affirmative. And beyond these two questions we had no occasion to go, and nothing short of this would have met the exigencies of the case.

The former opinion is adhered to.

ADAMS, CH. J., *dissenting.*